Teller, S.
The principal questions raised by the objections or answers to the account in this proceeding is whether the account should be surcharged with the amount of an insurance upon the life of the decedent, paid by the insurer upon a policy issued to the decedent a short time before his death, upon which but one- payment of premium had been made. The money was paid by the insurance company upon the joint receipt of these administrators and Mrs. Catherine Dunn, who claims to own the money by virtue of a gift inter vivos of the insurance policy to her from the deceased, made on the 20th day of July, 1885. There was no assignment in writing of the policy. A short time before the policy was issued, the deceased had received $3,000, to be used in his business, which money was raised in the following manner: A bond was made by the deceased and his father, Thomas Dunn, one of the present administrators, *768 and delivered to the party who loaned the money; to secure the payment of the bond a mortgage was executed and delivered by said Thomas Dunn and his said wife Catherine Dunn (the mother of the deceased), which mortgage was for the amount of the loan, and was- upon a farm owned by said Thomas and Catherine (husband and wife), as tenants in common. It is claimed by the contestants that the effect of the transfer to Catherine Dunn by the decedent of the insurance policy, was to furnish security against the obligation or liability which she had incurred for his benefit. The amounts are the same; the transactions are concurrent in time. There is evidence of declarations of Mrs. Dunn to that effect, and at the time of the receipting for the money .the parties characterized the transfer from the decedent as one “for value.”
It is further contended that if the delivery by the decedent was for the purpose of giving security merely, it became satisfied and of no further force. Then a statement was afterward made by Thomas Dunn, Sr., to certain creditors that the $3,000 was given to Thomas “to be used at the risk of the business.” In answer to the claim that the insurance policy was given by the decedent to his mother; it is also claimed by the contestants that the decedent was at the time owing more than the amount of his assets, and as to the creditors, the alleged gift was fraudulent within the statute.
The administrators concede the claim of Mrs. Dunn; but as one is her husband and the other the chosen friend of the family, who, before his appointment, was in this very matter confessedly acting for and in the interest of the claimant, it is incumbent upon the court to scrutinize the evidence carefully, to ascertain the exact agreement between the parties, independently of the views taken by the accounting parties. The fact that the administrators signed the receipt to the insurance company with Mrs. Dunn, is quite satisfactorily explained in the necessities of the case. The company would not make payment without a receipt from the administrators, or the judgment of a court. The receipt was given under advice of counsel. The moneys were deposited in the bank to await the decree of a court of competent jurisdiction; all was done, and properly, for the protection of the respective parties. The evidence to support a gift of the insurance policy to Mrs. Dunn is found in the testimony of Thomas Dunn, Henry S. Munson, and Nelson Beardsley, and in the fact that the policy, at the time of her son’s death, was found in the possession of the claimant.
The signing of the mortgage by Mrs. Dunn, was required to raise the money. Thomas Dunn testifies he gave his son the $3,000, the proceeds of the bond and mortgage. He says the boy then said to his mother, “You’ve made me a nice present; I have my life insured and I’ll make you a present of the policy in a few days.” Afterwards he and *769 his wife met the boy at the hotel where he boarded. His son then took the policy from his coat pocket and handed it to his mother and said: “ Mother, here is that policy that I promised you.” She took it and brought it home. The policy was dated July 10, 1885.
Henry S. Munson who acted for the company in taking Dunn’s application for insurance says; He said at the time I, took the insurance, he desired to give it to his mother. This was July 9th. I told him to make an assignment of it. He said he wanted me to get some blanks for assignment. I sent some to our agent at Auburn. Dunn did not say anything about assigning the policy to his parents for a loan, to my recollection. Nelson Beardsley testifies that he heard a conversation the day the bond and mortgage were given in regard to the insurance policy. His impression is the decedent told his mother to keep the policy for her security. He remembers he gave it to her for her benefit. He thinks the son handed the policy at that time to his mother. They were talking some little time. He would not undertake to say whether he said as security or I’ll give you that. The parents did it to help him start in business. The evidence given by these v itnesses all supports the theory that the decedent intended to and did deliver the policy of insurance to his mother for her benefit. That it was a voluntary act on his part and not made by either of the parents a condition of the payment to him of the proceeds of the bond and mortgage. The mother was not a party to the bond, but by executing the mortgage assumed a liability which might be wholly collected out of her sole property.
The youth of her son, and improbability that he would die before she did, may be considered in estimating the influence upon her mind of the benefit to her of the insurance as a motive to her of executing the mortgage. He was her only child. If we assume she was not induced by .the promise of an assignment .of the policy to sign the mortgage it cannot be of much consequence whether the son considered that he had received value for the transfer of his property in the insurance. A statement that it was for value received or given to secure against possible loss would not alter the nature of the transaction or take away the character of the gift, if the transfer was voluntary and absolute. Van Deusen v. Rowley, 8 N. Y., 358. There is other evidence given to support the claim of a gift to which it is perhaps proper to advert, but which cannot in the condition of the evidence have much weight.
A page from the diary of the deceased, under oate of July 20, 1885, was given in evidence. One witness testifies that the diary is in the handwriting of the deceased. The following words are fqund upon the page in evidence. “Father, mother at the hotel after dinner, and i gave her life insurance paper, $3,000.” The words “mother” and *770 “her” are written upon erasures and the pronoun “i” is-evidently inserted with a different pencil and in a different hand from the other writing. The witness who testifies-to the handwriting says: I should think those two words-“mother” and “her” are in Thomas Dunn’s handwriting. An examination of the writing and comparison with, the rest of the page leaves much doubt as to those words-being written by the same person who wrote the balance of the page. The terminal “r” in “her” is unlike that in any other word. The pronoun I in every other case is-properly written as a capital letter. Aside from this evi-' dence, I think all the testimony goes to prove the delivery of the insurance policy to Mrs. Dunn was in pursuance of a. gift, and it must be so held. It is contended that a gift cannot be upheld for the reason that its effect would be to-. hinder and delay his creditors, and therefore void or voidable for fraud. If this court were at liberty to consider the question, it does not seem that the facts would warrant the inference of fraud. The evidence does not show that the-lease taken by the intestate was worth less at the time of the gift than he had contracted to pay. It certainly does not appear tf t he so considered it. He is shown to have been indebted upon other demands in amount not exceeding $1,100. He had the $3,000 given him by his parents which was applicable to his indebtedness, and if any fraudulent purpose existed it must have related to obligations.
The gift was made with the knowledge and tacit consent of Mr. Beardsley, who made the $3,000 loan, and of Thomas Dunn, who had made himself responsible for its repayment. But can this court at this time determine the question of fraud? This is an accounting by an administrator as to the application of the personal property of an intestate. It does not appear in this proceeding that the decedent left no real estate to which hi: creditors may resort for satisfaction of their claims. A court of equity would not entertain an action to set aside the transfer upon the ground of fraud when no judgment has been obtained upon the demand. Adee v. Bigler, 81 N. Y., 349; 87 id., 585. Only after exhausting all legal remedies will a court of equity lend its aid to discover and apply the debtor’s property. The mere fact that a transfer of property was voluntary and without consideration is not sufficient evidence that it was fraudulent against creditors. Genesee River National Bank v. Mead, 92 N. Y., 637. In this case it was sought to set aside an assignment of a policy of insurance upon the life of' decedent, which assignment had been made to the person named as executor in decedent’s will. The court of appeals affirmed the decision of the lower court upon the ground that the evidence was not sufficient to constrain the court to find that the testator was insolvent at the time of the-assignment, or that it was made with intent to hinder, delay or defraud creditors. . The court below, fourth.depart *771 ment (13 Weekly Digest, 356), placed its decision upon the ground that a simple contract creditor, or one who has not exhausted his remedy at law, cannot maintain an action to set aside a transfer alleged to be fraudulent and void as against creditors. It is submitted by the contestants that the agreement in writing in evidence between the administrators Catherine Dunn, William H. Seward & Co. with regard to the possession of the moneys received upon the insurance, gives this court jurisdiction to determine the question of fraud in the transfer of the policy from the intestate to his mother. The language of the agreement in this behalf is, “but it is expressly agreed that in the event of the making of a decree or order by any court of competent jurisdiction ordering, adjudging or decreeing that the amount of said policy or the avails thereof constitute a part of the assets of said estate, then and in that case, the said money so deposited in trust as aforesaid, and the accumulations thereof, shall be paid to the said Hiram W. Babcock, as administrator, etc.” As to what was meant by the parties by a court of competent jurisdiction, or whether that was intended to be left a mooted question, does not satisfactorily appear; and so far as the authority of this court to pass upon the question of fraud is concerned, I hardly see how the agreement alters the case. Surrogates have not the power to investigate the merits of disputed claims against estates.
They have, however, the right to determine whether administrators have been guilty of negligence in getting together the property belonging to an estate, and whether they have failed to collect debts which they ought to have collected, and to decide whether they have acted prudently upon the information given in deciding whether certain demands or claims are collectible by legal proceedings. It appearing that the administrators have acted in good faith, upon the advise of able counsel, and are of the opinion that a claim is not recoverable, the evidence showing, as in this case, that an action in another court would probably result adversely, the court ought not to charge the administrators with the amount of the claim, or compel them to pursue a course which might, without benefit to the parties in interest, further deplete the estate by costs and expenses of litigation. The account, for these reasons, cannot be surcharged with the amount paid upon insurance. Secondly. It is claimed that the account should be surcharged with the sum of $307.43, which the deceased had on deposit at the First National Bank of Auburn, at the time of his death. The administrators submit that the bank cannot be compelled to pay this amount, or any part of it, for the reason that they held notes signed by the decedent, exceeding in amount the balance of his deposit, and that a short time before his death he had directed the cashier of the bank to apply this amount upon the notes.
*772 The notes were not due at the time of Thomas Dunn’o death, and without express direction to make such application, the bank would have had no right to do so. There was no equitable right of set-off which the court would enforce in an action brought against the bank for the amount of deposit. The evidence of Mr. O’Brien, however, is positive in regard to the direction given by the deceased as to the application of the money on deposit. He says: “We talked about the balance and in regard to closing up the account.” “ He said he was about closing out his business; he wanted the Rubier note paid, and the balance endorsed upon the $500 note.” “I told him that it would be done.” This conversation was a day or two before Dunn died; but it is not proven to have been prior to the last deposit of $190, which was made September twenty-fifth, the day before he died. It cannot be held to have been included in the agreement, and there being no authority in the bank officers to apply this deposit upon the notes not due, the administrators must be charged with that amount ($190). The witness, upon cross-examination, testifies that an action was brought upon the note since Thomas Dunn’s death, and it is agreed that this is evidence to show that the bank, at that time, did not consider the bank deposit as applied upon the note. It does not appear whether it whs so treated in the action, and nothing positive appears to vary the evidence of the agreement, and it must be held that the administrators, acting upon the same evidence here presented, are justified in taking no further action with regard to balance of the bank account.
The reason the courts have refused to allow set-offs of demands not due is, that it would have the effect to alter the agreement of the parties. Here the agreement of the parties is carried out. The contestants claim the administrators have been extravagant in their allowance of compensation to attorneys and others who assisted in the sale of property. While it is the desire of the court to compel reasonable economy in the administration of estates, it must be remembered that this case has been exceptional in the difficulties involved in disposing of the property of the intestate. It consisted of a stock of goods in a store lately opened, and involved the disposal of a lease for five years in which the decedent had obligated himself to pay. It was held in the case of Bradley v. Angel, executor, etc. (3 N. Y., 475) that a court of equity would not enforce a debt not due as a set-off against a demand of an insolvent party, although the circumstances being reversed the court would grant the relief. Herein was a bill filed by certain parties holding notes not due against a person who had died insolvent.
It was alleged that there was an agreement between the plaintiff and the decedent that the goods they should purchase of him should be applied as payment upon the notes. This allegation was denied; but it was alleged by the de *773 fendant that at the close of every six months the plaintiffs should execute drafts for balance due from them to decedent. The court says: When a debt is due from an insolvent debtor the right of a creditor to payment is absolute. If the latter holds a demand against his creditor not due, he has no right to retain it as an investment. * * By allowing a set-off in this case the executor would be deprived of a legal right secured to the testator by contract and the complainants would obtain payment of their debt before it became due, and to the prejudice of other creditors of the. decedent.
In the case of Myers v. Davis (22 N. Y., 489) it was held that until a demand becomes mature, a set-off may be defeated by the assignment of the claim of the opposite party, though the latter be insolvent and his demand has not become payable when assigned.
In the case of Newcomb, as receiver, v. Almy (96 N. Y., 308) it was held that the plaintiff, as receiver of an insurance company, was entitled to recover upon notes of defendant and that defendant could not off-set the reserve value of policies not due. A court of equity will not interfere to set off an equitable claim against a legal debt without some further equitable grounds.
A charge is made of $467.05, paid Fred M. Smith, for services connected with the sale of the stock of goods, one item of which is “ for making sale of stock and fixtures, $5,741.22, at five per cent., $287.05.” The balance of the charges in their bill, under the circumstances proven, would not seem to be unreasonable in amount, as the item specified relates to services as auctioneer. I think the administrators ought to have limited the charge to the compensation allowed by the statute. (R S., [7th ed.], 1275, § 23), two and a half per cent, on the amount of the sales. There must therefore be deducted from this bill the sum of $143.52. I see no good reason for charging the estate with two separate attorney’s, bills in the suit of Galland against them, accounting parties, and the charge of sixty-five dollars therefore will be disallowed.
The expense of making an inventory seems large, but it does not appear to have been unnecessarily so, except the one item of a copy of inventory. This appears to be charged for at ten cents a folio, counting figures as words. As it is nearly all figures, I think five dollars an ample amount to allow, and as the attorney to whom the amount was paid was present, assisting in the taking of the inventory at an additional expense to the estate, ten dollars may be deducted from this charge. Ho objection is made to the attorney’s bill for services rendered for the administrators, and no positive evidence has been given to show that it is unreasonable. It is difficult for the court to know, merely from the items of such a bill, whether the services have been necessarily employed, and in such cases opposing attorneys rarely *774 assist the court by contesting the claim. Items of charges in connection with the taking of the inventory and upon the sale, as well as the employment of two attornies to defend the Galland suit, quite forcibly suggests that the administrators have been somewhat more extravagant in this regard than they would have been if the compensation were to come from their private resources instead of the moneys belonging to the creditors. Suffice it to say, if executors and administrators would adopt the same business rules in dealing with their attornies that individuals do in their private affairs, much ground of criticism might be avoided; more retainers would probably be the result, and the court would often be relieved of much embarrassment due to Lhe attempt of parties to transact their own law business through the agency of surrogates and judges.
As agreed by the administrators, upon the hearing, the claim of Lefevre N. Rosa against the estate, will be reduced one-half. In all other respects the account is allowed, and a decree may be prepared accordingly, costs to be taxed upon notice to the parties who have appeared